[866 NYS2d 638]

BERNADETTE GOTAY, Respondent-Appellant, v DAVID BREITBART, Respondent, and MICHAEL HANDWERKER et al., Appellants-Respondents, et al., Defendants.

First Department, November 6, 2008

### APPEARANCES OF COUNSEL

*Furman, Kornfeld & Brennan LLP*, New York City (*A. Michael Furman* of counsel), for Michael Handwerker, appellant-respondent.

*Wilson, Elser, Moskowitz, Edelman & Dicker, LLP*, New York City (*Richard E. Lerner* and *Robert J. Pariser* of counsel), for Steve Marchelos and others, appellants-respondents.

*Gerald J. Mondora*, White Plains, for respondent-appellant.

*Goodman & Jacobs, LLP*, New York City (*Thomas J. Cirone* and *Sue C. Jacobs* of counsel), for David Breitbart, respondent.

### OPINION OF THE COURT

LIPPMAN, P.J.

Plaintiff seeks to recover for the malpractice of her former attorneys in connection with the prosecution of her underlying medical malpractice action. The question presented is whether the legal malpractice action is time-barred.

The medical malpractice action arose out of injuries plaintiff allegedly sustained during her birth in August 1977. In early 1978, plaintiff's mother retained the law firm of Kaufman & Siegel, and that now-defunct firm commenced the malpractice action on plaintiff's behalf in April of the same year. After a long period of apparent inactivity in the litigation, plaintiff's mother substituted defendant David Breitbart as counsel in 1993.

In 1994, former Breitbart associates Michael Handwerker, Neil Honschke and Steve Marchelos formed their own firm

(Handwerker, Honschke and Marchelos [HHM]) and became plaintiff's attorneys of record. After HHM dissolved in November 1998, defendant Handwerker became a member of Ross, Suchoff, Hankin, Maidenbaum, Handwerker & Mazel, P.C. (Ross Suchoff), bringing plaintiff's medical malpractice action with him. Shortly thereafter, Mark Hankin, a partner at Ross Suchoff, evaluated plaintiff's case and determined that Ross Suchoff would not represent plaintiff because an index number had never been purchased in the action. Plaintiff and her father were advised of Hankin's decision on January 28, 1999. Plaintiff commenced this action for attorney malpractice on January 31, 2002.*

Although Supreme Court granted defendants' motion to dismiss the action for failure to state a cause of action, this Court reversed (14 AD3d 452 [2005]), finding, inter alia, that the complaint adequately alleged that HHM had been negligent in failing to apply for an order of filing nunc pro tunc in the medical malpractice action (at 454). Defendants then moved for summary judgment, asserting that the action was time-barred and that there was no proof of damages attributable to the alleged negligence. Plaintiff cross-moved for summary judgment, arguing that the medical malpractice should be deemed admitted. Ultimately, upon reargument, Supreme Court denied the HHM defendants' motions, finding that those defendants had failed to make a prima facie showing that the attorney-client relationship had ended more than three years before plaintiff commenced this action.

Defendants' statute of limitations defense is premised upon the contention that their representation of plaintiff did not continue within the statutory period. "The continuous representation doctrine . . . 'recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered' " (*Shumsky v Eisenstein*, 96 NY2d 164, 167 [2001], quoting *Greene v Greene*, 56 NY2d 86, 94 [1982]). The statute of limitations is tolled while the attorney continues to represent the client on a particular matter, in part to protect the professional relationship (*see Shumsky*, 96 NY2d at 167-168). However, the representation must be related to the specific area that is the subject of the

* Plaintiff's motion, made by new counsel, to reactivate her medical malpractice action in Bronx County Supreme Court was denied in January 2003.

malpractice claim (*id.* at 168) and "there must be clear indicia of an ongoing continuous, developing, and dependent relationship between the client and the attorney' " (*Aaron v Roemer, Wallens & Mineaux*, 272 AD2d 752, 754 [2000], *lv dismissed* 96 NY2d 730 [2001], quoting *Luk Lamellen U. Kupplungbau GmbH v Lerner*, 166 AD2d 505, 506 [1990]).

The HHM defendants contend that the subject attorney-client relationship terminated in January 1998, or at the very latest on January 28, 1999. They urge that on the earlier occasion HHM partner Steve Marchelos met with plaintiff and her father and advised them that the medical malpractice action was dead and that they had the option to pursue a legal malpractice action against their former attorneys, Kaufman & Siegel. The record, however, is not in accord with this characterization of what transpired at the 1998 meeting. It is clear from Marchelos's deposition testimony that, at the time of the 1998 meeting, he simply did not know the actual status of the medical malpractice action and, accordingly, could not have accurately represented that the action was certainly "dead." Indeed, Marchelos testified that, as of the date of the meeting, he was still attempting to retrieve the court file and that he fully intended "to continue in trying to follow through, maybe with a resurrection of the file." There is no indication in the record that Marchelos made any contrary representation to plaintiff; he nowhere claims to have told plaintiff that HHM's efforts on her behalf had definitively concluded. Nor is there other evidence that that impression had been conveyed. There is no indication that the firm's file on the case was either offered by Marchelos or requested by plaintiff or her father and, in fact, the file remained in the firm's possession, where it evidently continued to be viewed as active, since it was among the files that defendant Handwerker took with him to Ross Suchoff in January 1999.

As noted, the file was given, presumably by Handwerker, to Ross Suchoff partner Hankin, and after Hankin reviewed the file and decided that Ross Suchoff would not take the matter, he met with plaintiff and her father on January 28, 1999. He told them that Ross Suchoff would not handle the case. Handwerker was not present at the meeting, and there is no proof that either plaintiff or her father was then aware that Handwerker had some weeks before become a member of Ross Suchoff. Under these circumstances, Hankin's representation to plaintiff respecting Ross Suchoff's disinterest in pursuing the matter

was insufficient to signal to plaintiff that her representation by HHM had terminated. Plaintiff's attorney-client relationship had been with HHM, and never with Ross Suchoff, and her interaction with Hankin, a new attorney at a new firm, cannot reasonably be viewed as having placed her on notice that her attorney-client relationship with her own attorneys at HHM had concluded.

Although defendants claim that plaintiff's father requested the return of plaintiff's file at the January 1999 meeting, the record simply does not permit us to conclude that such a request was in fact made. Indeed, it is clear that the file was not returned at the meeting or in its immediate aftermath and that the wishes of plaintiff and her father as to the file's disposition, if they were conveyed at all, were not clear to Hankin, for Hankin, in a February 22, 1999 follow-up letter, wrote to plaintiff and her father, "[y]our file remains in our possession. In the event you require the whole or any portion thereof, we are available to provide you with same."

The Court of Appeals has recognized it as "essential that the terms of [attorney-client] representation . . . be set down with clarity" (*Shaw v Manufacturers Hanover Trust Co.*, 68 NY2d 172, 179 [1986]). Although the need for such clarity has most often been remarked upon in connection with fee disputes, it is no less critical to have an explicit and accurate understanding of any other fundamental issue pertaining to the attorney-client relationship, including, obviously, the elemental issue of whether there is a relationship at all. There is no room for uncertainty on these matters, especially where, as here, attorneys deal with laypersons unversed in the nuances and intricacies of legal practice and expression; what may seem crystal clear to a lawyer may be utterly lost upon the client. If the attorney-client relationship has come to an end, that fact should be absolutely clear to all parties involved.

An attorney is required to provide reasonable notice to the client when withdrawing from representation (*see* CPLR 321 [b] [2]; Rules of App Div, 1st Dept [22 NYCRR] § 604.1 [d] [6]), and no definition of reasonable notice would require a client to infer, from ambiguous action or inaction on the part of her attorneys, much less on the part of an attorney with whom she had no relationship, that she is no longer represented. Particularly under the circumstances obtaining here, where the entire course of the litigation had been fraught with delay and a lack of communication between client and counsel, and where there had

been a series of largely inactive yet persistent attorney-client relationships, more than equivocal behavior was required to sever the representational relationship. The elaborate inferential constructs which the dissent finds so irresistible are not appropriately utilized to impute knowledge of the status of an attorney-client relation. It would have been a simple matter for HHM to advise plaintiff that in its estimation the medical malpractice action was unsalvageable and, consequently, that their relationship had run its course. Inasmuch, however, as the HHM defendants failed to meet their burden as proponents of the summary judgment motion to show prima facie that such unequivocal notice had been afforded, the motion was properly denied.

By contrast, plaintiff's action was shown to be time-barred as against defendant Breitbart because, although HHM was never formally substituted for Breitbart as counsel, it was clear to all parties involved that plaintiff had retained HHM to represent her in the underlying medical malpractice litigation (*see MacArthur v Hall, McNicol, Hamilton & Clark*, 217 AD2d 429 [1995]). The portion of this Court's prior decision (14 AD3d 452 [2005]) that denied Breitbart's motion to dismiss for failure to state a cause of action is not law of the case precluding the grant of summary judgment here, as it neither addressed nor resolved the statute of limitations issue (*see Mulder v Donaldson, Lufkin & Jenrette*, 224 AD2d 125, 131 [1996]).

The parties submitted conflicting expert opinions, raising an issue of fact as to whether plaintiff would have been successful in the underlying medical malpractice action. As a result, defendants are not entitled to summary judgment based on the alleged lack of a causal link between plaintiff's damages and defendants' alleged inaction in obtaining an index number and filing the medical malpractice action nunc pro tunc. Handwerker's argument that it is speculative whether a court would have granted a motion to purchase an index number and file a summons and complaint nunc pro tunc in the underlying action is precluded by this Court's prior decision (14 AD3d at 454).

Finally, Supreme Court properly denied plaintiff's cross motion for summary judgment as untimely, since plaintiff failed to demonstrate good cause for the delay (*see Brill v City of New York*, 2 NY3d 648, 652 [2004]).

Accordingly, the orders of Supreme Court, New York County (Joan A. Madden, J.), entered January 25, 2007 and July 30, 2007, which, insofar as appealed from, granted defendant Breit-

bart's motion for summary judgment, denied the motions of defendants Handwerker, Honschke, Marchelos and the partnership Handwerker, Honschke and Marchelos for summary judgment, and denied plaintiff's cross motion for summary judgment, should be affirmed, without costs.

FRIEDMAN, J. (dissenting in part). This legal malpractice action is the culmination of a long and convoluted chain of events that began three decades ago. Ultimately, however, the lawsuit's timeliness turns on an attorney's sworn—and entirely uncontradicted—account of what occurred at his meeting with plaintiff and her father on January 28, 1999, more than three years before the commencement of the action. The attorney (Mark Hankin) avers in his affidavit that, at the January 1999 meeting, he advised plaintiff and her father that his firm would not undertake plaintiff's representation in a medical malpractice matter arising from her birth in 1977.[1] Hankin further states that, in response to his rejection of plaintiff's case, "plaintiff's father requested the immediate return of the file."

In opposing defendants' summary judgment motion, plaintiff submitted no evidence of any kind—not in deposition testimony, not in an affidavit, not in a letter, not in a jotted piece of notepaper—controverting Hankin's account of the January 28, 1999 meeting. Indeed, Hankin's account of the meeting is not even challenged in plaintiff's appellate briefs. The majority nonetheless denies summary judgment to the appealing defendants, based on two theories never suggested by plaintiff. The majority's first theory is that plaintiff and her father (although neither makes this claim) were unaware that Michael Handwerker, the attorney who had accepted plaintiff's matter several years before, had joined Hankin's firm. The other theory the majority has devised is that Hankin's claim that plaintiff's father requested the return of the file at the January 1999 meeting is somehow placed in doubt by boilerplate language in Hankin's follow-up letter, dated February 22, 1999, offering to return the file "[i]n the event you require the whole or any portion thereof."

Given that defendants moved for summary judgment based on Hankin's sworn statement asserting a simple matter of fact about his meeting with plaintiff and her father, it was up to plaintiff, if she disagreed with that statement, to present evi-

---

**1.** Even the majority acknowledges that no issue of fact exists regarding the attorney's allegation that he advised plaintiff and her father at the January 1999 meeting that his firm would not undertake plaintiff's representation.

dence straightforwardly contradicting it. Plaintiff has not done this; indeed, her counsel does not even argue that other evidence in the record gives rise to a reasonable inference that the statement may be inaccurate. Instead, counsel bases plaintiff's opposition to summary judgment on an entirely different theory, which the majority does not even bother to discuss. Further, at no point in this litigation have plaintiff and her father denied that they were aware of the relationship between Hankin and Handwerker at the time of the January 1999 meeting. The majority's denial of summary judgment to the appealing defendants under these circumstances begs a question: Under what theory of the judicial function does a court have license, on a motion for summary judgment, to disregard an agreement on the facts evident from the submissions of the parties themselves? I submit that it is not properly within a court's role to manufacture an issue of fact that the party opposing summary judgment has not herself seen fit to raise, especially where, as here, the facts in question are within that party's knowledge.

The relevant facts begin with plaintiff's birth at Bronx Municipal Hospital Center (now known as Jacobi Hospital) in August 1977. The delivery was performed by Dr. Steven Rockman, a medical resident affiliated with the Albert Einstein College of Medicine of Yeshiva University. At birth, plaintiff manifested Erb's palsy of the upper right extremity. Erb's palsy is a condition in which motor control of the upper arm is reduced due to nerve damage incurred during childbirth.

In April 1978, the now-defunct law firm of Kaufman & Siegel, P.C. (K & S) commenced a medical malpractice action on plaintiff's behalf against the New York City Health & Hospitals Corporation (HHC), which operated the hospital where the delivery occurred. K & S also commenced an action based on the same facts against "Albert Einstein Hospital" and the Albert Einstein College of Medicine of Yeshiva University. Under the procedures that were applicable at the time, K & S commenced the actions by service of the summons and complaint, without purchasing an index number at the court designated as the venue of the actions (Bronx County Supreme Court).

Effective July 1, 1992, the CPLR was amended to require that actions be commenced by filing with the court and the purchase of an index number (see Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C304:1). At that point, although more than 14 years had passed since the commencement of plaintiff's medical malpractice ac-

tions, K & S still had not purchased an index number for the cases. K & S did not take advantage of the transitional rules under which plaintiffs in actions commenced under the previous commencement-by-service system were afforded a grace period within which to purchase an index number to comply with the new commencement-by-filing system.

In the fall of 1993 (more than 15 years after the commencement of the medical malpractice actions), plaintiff's father decided to discharge K & S and to give the matter to defendant Michael Handwerker, an attorney whose primary area of practice was criminal defense. At that time, Handwerker worked under a contractual arrangement in the office of defendant David Breitbart. Pursuant to that contractual arrangement, in November 1993, plaintiff (through her mother) formally retained Breitbart, and a "Consent to Change Attorney" was executed substituting Breitbart for K & S as plaintiff's counsel. In January 1994, the "Law Office of David Breitbart" served a bill of particulars on plaintiff's behalf.

In June 1994, Handwerker terminated his association with Breitbart and formed defendant Handwerker, Honschke and Marchelos (HHM), a law firm that was originally a partnership among defendants Handwerker, Steve Marchelos and Neil Honschke.[2] Plaintiff's medical malpractice actions were among the matters Handwerker brought to HHM. Although plaintiff's medical malpractice case remained at HHM until the firm's dissolution in November 1998, no one at HHM took any steps to remedy the failure to purchase index numbers for the matter. As noted in this Court's decision on the prior appeal in this action, although the medical malpractice actions conceivably could have been salvaged had index numbers been purchased in 1994 or 1995, HHM's inaction in this regard essentially doomed the lawsuits to the extent, if any, they were otherwise viable (*see* 14 AD3d 452, 454 [2005]).

Defendant Marchelos was the HHM attorney who actually worked on plaintiff's case while it was at that firm. In late 1995, Marchelos took some steps to obtain plaintiff's medical records. Thereafter, he made an unsuccessful attempt to locate a file for the matter at the office of the Bronx County Clerk. He also sought assistance from Janice Kabel, Esq., the attorney

---

2. The record reflects that HHM's membership and name changed more than once before the firm was finally dissolved in November 1998, but the parties do not argue that any such change is relevant to the disposition of this appeal.

who then headed the medical malpractice division at the office of the Corporation Counsel of the City of New York, the agency responsible for HHC's defense in litigation. According to uncontradicted affidavits by Marchelos and Kabel, Kabel told Marchelos at some point in early 1998 that she had ascertained that the Corporation Counsel had referred the case to the outside firm of Bower & Gardner (B & G), which had dissolved in 1994 (*see Bower & Gardner Weighs Dissolving*, NYLJ, July 29, 1994, at 1, col 3; *Today's News: Update*, NYLJ, Aug. 1, 1994, at 1, col 1). Kabel learned that B & G had "archived" the file in 1988. Kabel found no indication in the City's records of the reason that B & G archived the file, and her efforts to retrieve the file were unsuccessful.

Marchelos states that he inferred from the fact of B & G's archiving of the case file in 1988 that, as of that year, the medical malpractice actions had been either dismissed or abandoned. "Under either scenario," according to Marchelos's affidavit, "the file was [in his view] simply dead," given the passage of so many years. Marchelos so informed plaintiff in early 1998. His affidavit states:

> "I telephoned plaintiff's father and asked him to come with his daughter to my prior firm [HHM] for a conference to discuss their underlying medical malpractice action. We did eventually meet in early 1998. I explained everything that I had learned from my investigation, including my discussions with Ms. Kabel, even though it was not good news. I then went on to advise the plaintiff and her father that they might have a claim for legal malpractice against [K & S] for their handling of the underlying medical malpractice action. They asked me if I would consider commencing such an action on their behalf against [K & S]. I told them that I could not render services related to commencing a legal malpractice action because I was potentially a witness, and this was not my area of expertise." (Paragraph number omitted.)

Neither plaintiff nor her father testified at their depositions to any specific recollection of the meeting with Marchelos in early 1998, and the record does not include any affidavit by ei-

ther plaintiff or her father. Thus, Marchelos's account of the meeting is uncontroverted.[3]

The HHM firm dissolved in November 1998. In January 1999, Handwerker became a member of a new firm known as Ross, Suchoff, Hankin, Maidenbaum, Handwerker & Mazel, P.C. (Ross Suchoff). Handwerker proposed to bring plaintiff's medical malpractice matter with him to Ross Suchoff. Mark Hankin, a member of Ross Suchoff, reviewed the matter to determine whether the firm would accept it. Hankin discovered that no index number had ever been purchased for the medical malpractice actions. As Hankin states in his affidavit, upon making this discovery, Ross Suchoff "decided not to undertake the representation of the plaintiff in [her] action against Jacobi Hospital [sic]." As described in Hankin's affidavit, Hankin communicated this decision to plaintiff and her father at a meeting held on January 28, 1999:

> "Although the Ross Suchoff Firm was never retained by the plaintiff and did not have an attorney-client relationship with her or her parents, I met with the plaintiff and her father on January 28, 1999 to advise of the situation, as well as, my Firm's

---

**3.** The majority distorts the evidence when it asserts that "[t]he record . . . is not in accord with th[e] characterization [in Marchelos's affidavit] of what transpired at the 1998 meeting." To begin, the Marchelos affidavit is itself part of the record, so the majority's statement does not make sense. To the extent the majority is claiming that Marchelos's affidavit somehow contradicts his deposition testimony, that claim is simply mistaken. Contrary to the majority's claims, Marchelos never testified that "as of the date of the [1998] meeting, he was still attempting to retrieve the court file," a misapprehension on which the majority bases its assertion that Marchelos "could not have accurately represented [at the meeting] that the action was certainly 'dead.' " In fact, Marchelos's deposition testimony indicates that his effort (to which the majority refers) "to continue to try to follow through, maybe, with a resurrection of the file" occurred in "the early '90s"; he never put that effort within a more precise time frame or sequence of events at the deposition (and was never asked to do so). In his affidavit, however, Marchelos makes clear that the sequence of events was (1) his partially successful effort to retrieve medical records, (2) his unsuccessful attempt to retrieve a file for the case from the Bronx County Clerk, (3) his contact with Kabel of the Corporation Counsel in an unsuccessful attempt to obtain the B & G file, and, finally, (4) his early 1998 meeting with plaintiff and her father, at which he reported on the results of his efforts. Also, contrary to the majority's assertion that Marchelos "nowhere claims to have told plaintiff that HHM's efforts on her behalf had definitively concluded," Marchelos makes plain in his affidavit that he told plaintiff at the early 1998 meeting "everything that I had learned from my investigation," which included his conclusion that, whether the case had been dismissed or abandoned, "the file was simply dead."

decision not to undertake representation of the plaintiff in the underlying medical malpractice action. *At that point, the plaintiff's father requested the immediate return of the file.*

"Soon thereafter, I understand that the complete file in the underlying medical malpractice action was sent directly to the plaintiff's father." (Paragraph numbers omitted and emphasis added.)

Hankin sent plaintiff and her father a follow-up letter, dated February 22, 1999:

"As we discussed at our meeting on January 28, 1999 and on the phone [on] February 9, 1999, a review of the file indicates that your initial counsel, [K & S], never purchased an index number subsequent to their service upon the defendants of a copy of the summons and complaint in this matter. When they initially accepted this case, there was no requirement in the State of New York that an index number be purchased . . . In or about calendar year 1992, the statute in the State of New York was changed and our state became a file and serve' state where you were required to purchase an index number before service of the papers upon the defendants . . . Your attorneys [K & S] should have obtained an index number at that time in order to preserve your case for further action. Unfortunately, my review of the court records relative to both actions filed in this matter indicate[s] that no index number was purchased by your former counsel. Since more than one (1) year has elapsed since the new file and serve statute was enacted, the claims previously instituted are now dismissed. Our review of the case law indicates that based upon the passage of time, any attempt to purchase an index number now would be futile.

"Accordingly, we will not be able to proceed with the claims previously instituted on behalf of [plaintiff] for claims of medical malpractice. Your file remains in our possession. In the event you require the whole or any portion thereof, we are available to provide you with same."

Plaintiff did not testify at her deposition to any specific recollection of the January 28, 1999 meeting with Hankin. While

plaintiff's father, Jesus Morales, recalled the meeting, he did not contradict Hankin's account of the meeting in any way. Morales gave the following testimony about the meeting:

> "Q. This line [in Hankin's February 22, 1999 letter] referencing a meeting on January 28, 1999, do you remember that meeting? Do you remember attending that meeting?
>
> "A. A little bit. A little bit.
>
> "Q. What do you remember about that meeting?
>
> "A. I remember that . . . he said something that [K & S] didn't purchase a number—
>
> "Q. Okay.
>
> "A. —an index number for that case.
>
> "Q. What did he say about not purchasing the index number? What did that mean? What—
>
> "A. I don't remember that. All I remember is that part. . . .
>
> "Q. What else do you remember at the meeting?
>
> "A. All I could remember is that he said, 'I can't understand why he did not purchase an index number.' That was it.
>
> "Q. Did you ask the attorney what not purchasing an index number meant or what the significance of that was?
>
> "A. He might have explained, but I don't remember. . . .
>
> "Q. Do you remember having any conversation with these attorneys about not being able to continue your case for you at that January 28 meeting?
>
> "A. I don't remember."

As previously noted, on January 31, 2002, more than three years after the January 28, 1999 meeting with Hankin (and about four years after the 1998 meeting with Marchelos), plaintiff commenced this legal malpractice action against Handwerker, Marchelos, Honschke, and the HHM firm (collectively,

the HHM defendants) and Breitbart, among others.[4] After joinder of issue, discovery proceedings, and the dismissal of the other defendants from the action, the HHM defendants and Breitbart moved for summary judgment on the ground, among others, that the legal malpractice action had been commenced after expiration of the three-year statute of limitations (CPLR 214 [6]). The motions were supported by, inter alia, the aforementioned affidavits of Marchelos, Kabel and Hankin, and by transcripts of the depositions of plaintiff, plaintiff's father, and all individual movants. As previously noted, neither plaintiff nor her father submitted an opposition affidavit. Thus, to reiterate, Marchelos's and Hankin's accounts of their respective meetings with plaintiff and her father are entirely undisputed.

Supreme Court initially granted summary judgment to all the movants based on the statute of limitations. The court noted that the continuous representation doctrine could not extend the limitations period beyond January 28, 1999 as to claims against any of the HHM defendants, since "[n]either plaintiff nor Morales [her father] disputes Hankin's assertions that, at the January 28, 1999 meeting, he advised them that the Ross Suchoff Firm had decided not to undertake representation of plaintiff in the [medical malpractice actions], and Morales requested the return of the file for [those actions]." (2007 NY Slip Op 34349[U], *9.) The court further observed that, in the absence of any contrary allegations by plaintiff or Morales, it could be presumed that they understood, among other things, (1) that the case file "was in Hankin's possession because Handwerker had brought it with him to the Ross Suchoff Firm when he joined that firm as a partner," and (2) that "Morales' request [at the January 28, 1999 meeting] that the case file be returned to him meant that neither the Ross Suchoff Firm, nor [HHM], nor any of [HHM's] former partners [i.e., Handwerker, Marchelos and Honschke], would thereafter continue to represent plaintiff, or perform any additional work, in connection with plaintiff's medical malpractice claims." (*Id.*)

Plaintiff subsequently moved for reargument. The sole argument offered in plaintiff's counsel's affirmation in support of the reargument motion was a repetition of what had been plaintiff's primary argument on the statute of limitations issue in opposing the original motions, namely, that the legal mal-

---

**4.** Plaintiff's claims against all other named defendants (including Ross Suchoff and Hankin) were previously dismissed and are not at issue on this appeal.

practice claim should not be deemed to have accrued until the medical malpractice action against HHC was finally dismissed by Bronx County Supreme Court in 2003.[5] Plaintiff's counsel did not claim that the court had overlooked any evidence giving rise to a triable issue as to what had occurred at the January 28, 1999 meeting with Hankin, or whether plaintiff and her father had understood after that meeting that the HHM defendants were no longer representing plaintiff on her medical malpractice claims.

Supreme Court granted plaintiff's reargument motion and, upon reargument, reinstated the complaint as against the HHM defendants (but not as against Breitbart, whose involvement in the case had ended in 1994). In denying summary judgment to the HHM defendants, the court did not adopt plaintiff's theory that the legal malpractice claim did not accrue until the belated dismissal of the underlying medical malpractice action in 2003. Rather, the court relied on a rationale plaintiff had never suggested—and, on appeal, still does not suggest—that

> "the record [does not] set forth any basis for imputing to plaintiff or her father, as of the time of the meeting [with Hankin on January 28, 1999], actual or constructive knowledge of any particular relation or association between Handwerker, or [HHM], on the one hand, and Hankin, or the Ross Suchoff Firm, on the other." (2007 NY Slip Op 32310[U], *16.)

On appeal, the majority affirms the denial of summary judgment to the HHM defendants on the same rationale Supreme Court created, at its own instance, on reargument. The majority relies on this theory even though, as previously indicated, plaintiff herself has not adopted it in her appellate briefs. On the undisputed facts of this case, the denial of summary judgment to the HHM defendants on the time-bar issue, on the ground that plaintiff may not have recognized the relationship between Handwerker and Hankin, flies in the face of common sense, given that plaintiff herself does not even claim to have been unaware of the relationship. Nor is any issue of fact concerning what happened at the January 1999 meeting created

---

5. In 2002, plaintiff's present counsel purchased an index number for the medical malpractice action against HHC and moved for an order "reactivating" that lawsuit. HHC cross-moved for dismissal on the ground of laches. In 2003, Bronx County Supreme Court denied plaintiff's motion and granted HHC's cross motion.

by Hankin's February 1999 follow-up letter; here, again, not even plaintiff argues that such an issue of fact exists. I therefore respectfully dissent from the affirmance of the denial of summary judgment to the HHM defendants.[6]

At the outset, I note that, whenever plaintiff's legal malpractice claim against a given attorney or law firm accrued, the three-year statute of limitations governing that claim did not begin to run until the attorney's or firm's representation of plaintiff on the medical malpractice matter ended. This is the result of the continuous representation doctrine, which "tolls the running of the Statute of Limitations on [a] malpractice claim until the ongoing representation is completed" (*Glamm v Allen*, 57 NY2d 87, 94 [1982]). The Court of Appeals has explained the rationale for the continuous representation doctrine as follows:

> "[T]he rule recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered. Neither is a person expected to jeopardize his pending case or his relationship with the attorney handling that case during the period that the attorney continues to represent the person." (*Id.* at 93-94 [internal quotation marks and citation omitted].)

Consistent with its purpose, "[t]he continuous representation doctrine tolls the statute of limitations only where there is a mutual understanding of the need for further representation on the specific subject matter underlying the malpractice claim" (*McCoy v Feinman*, 99 NY2d 295, 306 [2002]). Stated otherwise, the toll for continuous representation will not be applied unless there are " 'clear indicia of an ongoing, continuous, developing and dependent relationship between the client and the attorney' " (*Matter of Merker*, 18 AD3d 332, 332-333 [2005], quoting *Muller v Sturman*, 79 AD2d 482, 485 [1981]). Thus, "even when further representation concerning the specific matter in which the attorney allegedly committed the complained of malpractice is needed and contemplated by the client, the continuous representation toll would nonetheless end *once the client is*

---

**6.** I concur in the affirmance of the dismissal of the complaint as against defendant David Breitbart, substantially for the reasons stated by the majority.

*informed or otherwise put on notice of the attorney's withdrawal from representation*" (*Shumsky v Eisenstein*, 96 NY2d 164, 170-171 [2001] [emphasis added]). The uncontroverted record evidence establishes that, here, plaintiff was "informed" and "put on notice" that the HHM defendants were withdrawing from her representation more than three years before she commenced this lawsuit.

On this record, plaintiff reasonably should have understood from what Marchelos told her and her father at the meeting in early 1998 that HHM would no longer be able to represent her on the medical malpractice claims. However, even if I were to accept the majority's view that the early 1998 meeting with Marchelos is not sufficient to establish the termination of the attorney-client relationship between the HHM defendants and plaintiff, any remaining relationship was plainly terminated at the January 28, 1999 meeting with Hankin. At that meeting, according to Hankin's entirely uncontradicted account, Hankin advised plaintiff and her father of Ross Suchoff's "decision not to undertake representation of the plaintiff in the underlying medical malpractice action," whereupon "the plaintiff's father requested the immediate return of the file." Plaintiff's father's request for the return of the file at the January 28, 1999 meeting—which, to reiterate, is an uncontroverted fact on this record—completely negates any possible inference that there was, at the close of the meeting, any remaining "mutual understanding of the need for further representation" on the medical malpractice claims (*McCoy*, 99 NY2d at 306). Accordingly, with respect to all the HHM defendants, the toll of the statute of limitations based on the continuous representation doctrine ended, at the latest, on January 28, 1999. Thus, this action was time-barred when it was commenced more than three years later, on January 31, 2002.

The majority resists this conclusion by adopting the fanciful hypothesis conceived by Supreme Court—but never advanced by plaintiff, and without support in the record—that plaintiff was not aware of the relationship between Handwerker and the firm that rejected her case at the January 28, 1999 meeting (Ross Suchoff). The illogic of this position is astonishing. Is the majority positing that plaintiff may have believed that Hankin called her and her father to the January 28, 1999 meeting out of the blue, without any connection to any attorney who had previously been involved in the matter? Again, plaintiff has not submitted an iota of evidence to suggest that this was the case.

Thus, the majority, following Supreme Court, is essentially injecting a factual issue into the case that the parties themselves have not raised. I do not believe that this is properly within the scope of the judicial function.

In any event, the record establishes that Morales, plaintiff's father, understood full well that Hankin was connected to Handwerker at the time of the January 28, 1999 meeting. Such understanding is demonstrated by the request Morales made at the meeting for the return of the case file. Morales had caused the file to be transmitted to Handwerker in 1993. By requesting that Hankin return the file at the January 28, 1999 meeting, Morales plainly manifested his understanding that Hankin had received the file from Handwerker when Handwerker joined the Ross Suchoff firm. Thus, in demanding the return of the file, Morales was taking the case away from Handwerker and any attorney or firm then or previously associated with Handwerker, including the HHM firm, Marchelos and Honschke. One need not fashion any "elaborate inferential constructs" from "ambiguous action or inaction on the part of [plaintiff's] attorneys" to recognize that Morales's request for the file unequivocally manifested an understanding that the attorney-client relationship with the HHM defendants—to whom Morales had originally given the file, and from whom Hankin had received it—was at an end.[7] At that point, if not earlier, the toll of the statute of limitations for continuous representation was lifted as to the HHM defendants.

The majority also argues that Hankin's uncontradicted statement that Morales requested the return of plaintiff's file at the January 1999 meeting should be disregarded because the February 22, 1999 follow-up letter Hankin sent plaintiff and her father contained the following language: "Your file remains in our possession. In the event you require the whole or any portion thereof, we are available to provide you with same." I see no contradiction between Hankin's affidavit and the two innocuous sentences from his letter highlighted by the majority. Obviously, there is often a delay between the making of a request and compliance therewith. Further, if plaintiff took the

---

7. To the extent the majority may believe that plaintiff somehow lacked the ability to understand the import of what transpired at the January 1999 meeting, I note that she ultimately graduated from college, worked as a legal assistant at Cadwalader, Wickersham & Taft, and, at the time of her deposition, was employed as an intelligence analyst by a contractor for the Drug Enforcement Administration.

position that her father did not ask for the file at the January 28, 1999 meeting, it was her burden to come forward with competent evidence denying that such a request was made. This she failed to do. Once again, the majority uses "elaborate inferential constructs" to manufacture an issue of fact that plaintiff herself has not raised.

In sum, the inescapable conclusion is that plaintiff's attorney-client relationship with defendants ended on January 28, 1999, at the latest, and any toll of the statute of limitations ended on that day as well. Thus, the action was untimely when plaintiff commenced it on January 31, 2002, more than three years later.

GONZALEZ and ACOSTA, JJ., concur with LIPPMAN, P.J.; FRIED-MAN, J., dissents in part in a separate opinion.

Orders, Supreme Court, New York County, entered January 25, 2007 and July 30, 2007, affirmed, without costs.